CARL A. WESCOTT
8210 E. VIA DE LA ESCUELA
SCOTTSDALE AZ 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688





CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## DISTRICT OF CALIFORNIA

## EASTERN DISTRICT

2:22 - CV 0179  JAM KJN PS

CARL A. WESCOTT,

           Plaintiff,

    vs.

SUSIE YEE;

           Defendant

+ DOES 1 through 1

Civil Action No.

**PLAINTIFF'S LEGAL COMPLAINT FOR BREACH OF CONTRACT, PROMISSORY FRAUD; PROMISSORY ESTOPPEL; NEGLIGENT MISREPRESENTATION; TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS; INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

1

**PLAINTIFF'S LEGAL COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; PROMISSORY ESTOPPEL; NEGLIGENT MISREPRESENTATION; TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS; INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

1    Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendant Susie Yee, and in

2    support of his Complaint, the Plaintiff states as follows.

## PARTIES

1. The Plaintiff is a resident of Scottsdale, Arizona.

2. Ms. Susie Yee is a resident of Vallejo, CA. Ms. Yee is one of a set of twenty-two positively

    identified and confirmed individuals (partners) who entered into a contract with the Plaintiff to

    fund his US $500,000 purchase of a company ("Seaside Mariana") and pay him an additional

    $334,000 in exchange for the Plaintiff transferring the 1000 acres of beach land owned by that

    company to them. (The full name of the company was and is Seaside Mariana Spa and Golf

    Resort, but in this legal complaint the company and the development project shall be referred to

    the same way the parties refer to it, as "Seaside Mariana" or "SM").

## VENUE

3. Venue is appropriate in this Court as Ms. Yee resides and work in this district, and we have

    complete diversity under 28 USC 1332 and $75k or more of damages.

## FURTHER ALLEGATIONS REGARDING CONSPIRACY

4. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint,

    Susie Yee was in conspiracy with David Crowe, Robert Crowe, Taylor Collings; Mike

    Lyonette; Thomas Madden; Jeff Rau; Darrell Bushnell; Amy Bushnell; Kathy Fettke; Susie

    Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin

    Ross, Brad Malcolm, Michael Jimenez, and Gustavo Varela, as individuals, in addition to acting

for himself/herself and on his/her own behalf individually, as well as for the benefit of his or her marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendant (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

5. Plaintiff further alleges on information and belief that the acts and non-acts of each of the Defendant was fully ratified by each and all the other Defendant. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendant was approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendant (individual and corporate).

6. In addition, upon information and belief, there exist one or more nefarious corporate, trust, LLC and/or other entity type Defendant involved in these conspiracies, currently unknown to Plaintiff. They shall emerge with the benefit of legal discovery.

7. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendant (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

8. Plaintiff further alleges on information and belief that the acts of each of the Defendant was fully ratified by each and all of the Defendant. Specifically, and without limitation, Plaintiff

1   alleges on information and belief that the tortious actions, failures to act, breaches, and

2   negligence alleged herein and attributed to one or more of the specific Defendant was approved,

3   ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all

4   other Defendant (individual and corporate).

5

6

**CASE SUMMARY**

7

8   The Plaintiff has included a brief case summary in plain language as Exhibit C (Sworn to be true in

9   Exhibit F, Sworn Affidavit of Carl A. Wescott).

10

**BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT**

11

12   9.   The Plaintiff was an experienced international real estate developer focusing on residential

13        developments in Latin America.  The Plaintiff is now gaining some insight into the distressed

14        asset markets, especially in the cases of projects that had significant economic viability but have

15        foundered for reasons unrelated to that viability, often involving politics, personalities or fraud.

16        (Sworn to be true, as is each successive paragraph, in Exhibit F, Sworn Affidavit of Carl A.

17        Wescott).

18

19   10.  The Plaintiff was reasonably successful until the global meltdown and credit crunch of 9/2008.

20        With the global impact of said credit crunch and the leverage the Plaintiff had applied to his real

21        estate holdings, the Plaintiff eventually succumbed to those forces and declared chapter 7

22        bankruptcy.

23

24   11.  Post-bankruptcy, the Plaintiff searched for distressed real estate assets that he could acquire and

25        turn around.  He was familiar with Seaside Mariana ("SM"), an ambitious development on

26        approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua.  Seaside

4

Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

12. SM was an attractive investment and development opportunity for the original developer, Kevin Fleming, for at least the following reasons:

      (i)     The real estate was prime in terms of location and amenities;

      (ii)    At the time of initial investment, the market was rising faster than linearly;

      (iii)   Costa Rica to the South had already surfed a 20-year wave of real estate equity appreciation, and for some product types there was an order of magnitude difference in pricing;

      (iv)   Nicaragua was attractive for American retirees in particular because of its low cost of living, level of safety, accessibility (including airlift), and desirable climate.

13. Most of those reasons were relevant more recently to the Plaintiff as well for his investment consideration.

14. Further, the intangible assets associated with SM were sound and mostly in place, including plans, permits, designs, and marketing material.

15. There were a few other intangible assets owned by SM that the Plaintiff found particularly interesting and compelling.

16. The value of the project was, to a material degree, artificially depressed by more recent market conditions and bad word of mouth and internet postings concerning the lack of infrastructure put in by the original developer, leading to further relevant issues.

17. The Plaintiff blushes to admit he has entered contract to purchase SM three (3) times. The first time he entered contract, the Plaintiff saw an opportunity to buy SM for a highly attractive price (US $500,000, plus some capped deferred payments), solve the issues, and complete the development, and had a backer who would provide financial support for the project.

18. Most recently, the Plaintiff entered into contract ("the SM Purchase Contract") to purchase SM (either the company itself or the real estate, at his option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018.

19. The Plaintiff planned to purchase the SM company.

20. Lacking in capital, the Plaintiff entered discussions with several investors to back the purchase.

21. More recently, in August 2018, the Plaintiff entered in to a contract with investors, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by SM (the Sociedad Anonima).

22. That contract shall be referred to as the "Funding Contract", and is attached hereto as Exhibit D.

23. To dispel any confusion over identities in the contract, the Plaintiff, Carl Wescott, is sometimes referred to by his Finnish name "Kalle", or the combination Carl "Kalle" Wescott.

24. To further dispel any potential confusion over the language of the funding contract or its meaning, the investors who were parties to the Funding Contract had filed litigation against Seaside Mariana, the company that the Plaintiff was purchasing. Therefore, the group of twenty-two investors (the same set of people who were the initial twenty-two (22) Defendant in Maricopa County Superior Court case CV2020-006232, including Susie Yee) who were the parties to that litigation are referred to as the "Litigating Group."

25. The Plaintiff did not want ongoing litigation against the company he was purchasing, and he had worked out a deal with the Litigating Group, and thus the thought was that he (aka "the Settler") would immediately settle with the Litigating Group upon closing the purchase of the Seaside Mariana company, by transferring all its land to them.

26. They, in turn, had already agreed to fund all US $500,000 the Plaintiff (and "Settler") needed to purchase the SM company, plus most of the closing costs.

27. Once the Plaintiff effectuated the transfer of the SM land (via the Seaside Mariana company, which he would then own and control) to the Litigating Group, they would then pay the Plaintiff/Settler, and his company, another US $334,000 in quarterly payments.

28. That group of twenty-two (22) investors (the named Defendant in CV2020-006232, aka "the Litigating Group), including Susie Yee, all agreed to collectively be bound by the Funding Contract and to fund the payments in the Funding Contract.

29. Two of the Defendant, David Crowe and Mike Lyonette, agreed to manage their group and, for expediency, communications with the Plaintiff.

30. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who agreed to be bound by the Funding Contract: David Crowe; Mike Lyonette; Thomas P. Madden; Susie Yee; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela; Robert Crowe; Bernadette Brown; Federico Gurdian; and Terencio Garcia.

31. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of twenty-two (22) investors.

32. For stylistic purposes and economy of phrase, the above twenty-two (22) Defendant, who acted in concert to fund the Plaintiff's purchase of SM, will also be described as "the Crowe Group" – this is the descriptive phrase that the parties all used colloquially, before the need for the litigation in the case at bar.

33. In August 2018, David Crowe and Mike Lyonette signed NCNDs with the Plaintiff.

34. Mr. Crowe and Mr. Lyonette also pledged not to share any information about the Plaintiff or the Funding Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure).

35. Approximately 10 of the 20+ investors signed NDAs with the Plaintiff, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Funding Contract and their NDAs, the Plaintiff believes only the dozen or so of them would have gotten information related to the Funding Contract and its progress towards a closing after that point.

36. The Plaintiff does not believe that Susie Yee deigned to sign a NDAs with him. Susie Yee was still part of the Crowe Group and bound by the Funding Contract and the NC ("Non-Circumvention Agreement").

37. The NDAs that approximately ten of the other twenty-two Crowe Group partners signed granted jurisdiction of the Plaintiff's choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision, given the Plaintiff's deals, would likely cost the Plaintiff over US $10 million in damages.

38. The Plaintiff shared information with Mr. David Crowe in strict confidence on how he expected to monetize the intangible assets of the Seaside Mariana company.

**PLAINTIFF'S OTHER DEALS WITH KEVIN FLEMING**

39. After the Funding Contract was signed, the Plaintiff signed more contracts with Kevin Fleming, to purchase Isla Mariana (another real estate development) and to purchase seven more Panamanian and Nicaraguan companies.

40. The Plaintiff also purchased all the legal claims of Kevin Fleming, Maria Rueda, and the relevant entities.

41. Outside of Seaside Mariana, and as shall be proven in court, the Plaintiff expected to possibly make as much as on the order of US $2,000,000 to US $3,000,000 more with the completion of the other deals.

42. The Plaintiff disclosed the existence of his other deals with Kevin Fleming to the Crowe Group via Mr. David Crowe (and another deal he was working on in Jamaica).

43. One particular reason the Plaintiff and Mr. Crowe shared information on the Plaintiff's other contracts with Kevin Fleming et al. was to ensure that both purchasing parties (the Plaintiff, buying another residential development called Isla Mariana from its owners; and the Crowe Group, essentially purchasing ~1000 acres of Seaside Mariana via the Plaintiff) were getting the land that they expected to get.

44. Because the Plaintiff was also purchasing Mr. Fleming's development company Nicaragua Developments (which also owned land), and the parent company of Seaside Mariana (Grupo Mariana), via some of these other deals, the Plaintiff would have the power and ability to ensure that his and the Crowe Group's expectations were met.

45. The Crowe Group had information on Seaside Mariana going back to 2006, and thus was able to build maps of all the Seaside Mariana land, including the list of parcels they would get

9

transferred at the Plaintiff's close of the purchase of the Seaside Mariana company. (Because a massive subdivision had occurred, this was important).

## NDA (NONDISCLOSURE AGREEMENT) BREACHES UPON INFORMATION & BELIEF

46. Upon information and belief, David Crowe and Mike Lyonette violated the terms of the NDA and shared deal information with other parties that had not signed the NDA (the Plaintiff is in Court with them in United States District Court, District of California, Northern).

47. Because the Plaintiff was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors.

48. In addition, as referenced above, and as shall be fully proven at jury trial, the Plaintiff expected to make a much larger sum monetizing the intangible assets he was acquiring as part of this deal.

49. The Crowe Group performed its due diligence on the deal and agreed to move forward to a close.

50. As part of due diligence, the Crowe Group had its attorney go to the local municipal office and ensure that Seaside Mariana still owned all of the relevant land fee simple, and that there was no secured debt mortgage obligation on the land, and no unexpected liens nor unexpected notations in the property registry.

51. After the Crowe Group's due diligence, the Crowe Group (including Susie Yee) agreed that they would fund the $25,000 that the Plaintiff was required to submit to Kevin Fleming after his due diligence.

1   52. That moment would also kick off a 60-day closing cycle for the Plaintiff to close on his

2       purchase of SM, and for the Litigating Group (the Crowe Group, including Susie Yee) to fund

3       said purchase.

4   53. Because the Plaintiff knew that Seaside Mariana had taken in US $ 22 million in sales from

5       purchasers and investors, the Plaintiff insisted that Kevin Fleming and the other owners of

6       Seaside Mariana file taxes up to the present.

7

8   54. The Plaintiff negotiated a Closing Contract with Kevin Fleming which the relevant parties

9       signed, in which the parties agreed to close on the Plaintiff's purchase (their sale) of the Seaside

10      Mariana company within 60 days.

11   55. As part of the Closing Contract, the Plaintiff would pass through US $25,000 to Kevin Fleming,

12      which Mr. Fleming pledged to use in significant part for tax professionals to file all of Seaside

13      Mariana's taxes through the present. (Some of it would be used by the Seaside Mariana sellers

14      to prepare for closing).

15

16   56. David Crowe then remitted a $25,000 cashier's check, which the Plaintiff utilized to satisfy his

17      obligation (in the Closing Contract) to fund the closing process, by depositing the check in to

18      Kevin Fleming's Wells Fargo bank account.

19   57. (In the Funding Contract, the Twenty-Five Thousand Dollars is on page 1, Article I, paragraph

20      1, where it is a non-refundable deposit).

21

22   58. It is worth noting that early in the Plaintiff's process with the Crowe Group, the Crowe Group

23      had essentially committed to funding the purchase but only if everything was as they expected

24      (due diligence on all files and details), and further details could be worked out.

25

26

59. As of early August, 2018, when the Crowe Group / Litigating Group agreed to the Funding Contract with the Plaintiff, the Crowe Group still had one contingency to pull out of the deal, if anything about their due diligence did not pass muster, also in the Funding Contract, page 1, Article I, paragraph 1, where the Crowe Group could let the Funding Contract unwind.

60. However, once the Crowe Group / Litigating Group had completed due diligence and remitted the US $25,000 non-refundable deposit towards the US $500,000 purchase price the Plaintiff had to pay to purchase the SM company (US $475,000 more after the US $25,000), the Crowe Group no longer had any contingency to pull out of the deal.

61. At that point, the Crowe Group (including this Defendant) were fully committed to the funding outlined for the Plaintiff's purchase of Seaside Mariana, with no contingency or other way to get out of the Funding Contract.

## DEFENDANT'S INITIAL BREACH

62. The Funding Contract called for a closing date in mid-October-2018, as did the Plaintiff's purchase contract of Seaside Mariana (reinforced in subsequent signed Closing Contracts).

63. The parties retained attorneys to prepare closing documents.

64. The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings.

65. In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa Resorts company, which owned all the land, using another US $475,000 of the Crowe Group's money for said close.

66. Then, the Plaintiff would transfer the lands in the Funding Contract to the entity of the Crowe Group's choice. (The Plaintiff or his designated entity would then get the other US $334,000 promised by this Defendant in a series of quarterly payments in 2019 and early 2020).

67. It is worth noting that one condition of close (in the Closing Contract) was not fulfilled by Kevin Fleming; namely, he did not file the taxes for Seaside Mariana for the missing years.

68. However, this was the Plaintiff's issue and not the Crowe Group's. The Plaintiff would be the owner of the Seaside Mariana company. The Plaintiff worked out with David Crowe, on behalf of the Crowe Group, that he would take responsibility for the taxes and simply file them for Seaside Mariana, as the new owner, after the close of his purchase of the SM company.

69. The Crowe Group agreed, via David Crowe, that this was acceptable to them and would not be a barrier to the close, nor their funding of it.

70. As part of the logistics for the close, the Plaintiff offered to provide a limited power of attorney in the Plaintiff's name, to David Crowe's wife, that would be valid only to transfer the Seaside Mariana land out of the Seaside Mariana company.

71. At this point, in October 2018, the Plaintiff had fully performed as per the parties' contract, as far as he could without the US $475,000 promised in the Funding Contract. Within a few days, with the help of attorneys, the closing would happen, and using the Crowe Group's US $475,000, the Plaintiff would purchase the Seaside Mariana company, thereby owning its shares.

72. The Plaintiff would then immediately transfer the land to the Crowe Group's designated new entity (or let Mr. Crowe's wife handle this step via the limited power of attorney).

73. It was now time for the Defendant to perform with the rest of the funding promised in the Funding Contract for the Plaintiff's purchase of the Seaside Mariana company; namely, the additional US $475,000.

74. However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group (including Susie Yee), informed the Plaintiff that there was a new issue that could impact the anticipated closing.

75. Mr. Crowe informed the Plaintiff that Mr. Ted Cole had sued Seaside Mariana again. (Mr. Cole had previously sued Seaside Mariana and settled for a significant part of the Seaside Mariana land).

76. At this point, the Litigating Group was already aware of the other contracts the Plaintiff had signed with Kevin Fleming, Maria Rueda, Grupo Mariana, and Nicaragua Developments to purchase another eight of the real estate ownership and real estate development company.

77. David Crowe and the Litigating Group were also aware of a deal the Plaintiff was working on with the Jamaican government, as Mr. Crowe kindly lent the Plaintiff $5,000 so he could travel to Jamaica and for related costs. (In a few successive loans, Mr. Crowe kindly lent the Plaintiff approximately US $11,500, which the Plaintiff would like to repay to Mr. Crowe, with interest, when he is able).

78. The Plaintiff then revealed to Mr. Crowe, and thus (constructive notice) these two Defendant, that he had also purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims. The Plaintiff thus had the right, using assigned legal claims, to sue Mr. Cole for his past tortious acts against Mr. Fleming, Ms. Rueda, and the Seaside Mariana company.

79. Mr. Crowe and the Plaintiff obtained a copy of the new Ted Cole legal complaint, and it was frivolous at best.

80. The Plaintiff was therefore unconcerned about the Cole litigation and planned defensive litigation for Seaside Mariana as soon as the Plaintiff owned the Seaside Mariana company in a few days.

81. The Plaintiff proposed to this Defendant, via Mr. Crowe, that the combination of offensive litigation against Mr. Cole (for past tortious acts) and defending the frivolous new legal complaint would be a simple, inexpensive, and effective remedy to solve any concerns about the Cole legal complaint.

82. Further, as the Plaintiff pointed out, the new Cole litigation was the Plaintiff's problem, as the soon-to-be-owner of the Seaside Mariana company, which was the entity getting sued.

83. The Plaintiff pointed out that within days the Seaside Mariana land would be transferred to the Litigating Group's designated new entity. As the entity was about to be formed, it clearly would have no liability to anyone including Mr. Cole.

84. However, the Litigating Group, including this Defendant, refused to fund the Plaintiff's purchase of the Seaside Mariana company (contrary to their promises, representations, obligations, and responsibilities set out in the Funding Contract).

85. David Crowe then assured the Plaintiff that Seaside Mariana was no longer attractive to any of the Litigating Group, including Susie Yee.

86. The reason stated by Mr. Crowe that the Litigating Group now had zero interest in the SM company and SM land, and that they also had zero interest in honoring the Funding Contract, was the new Ted Cole litigation. (This is not a valid reason to breach a contract but is interesting in light of Mr. Crowe and the Litigating Group's further actions, below)

**THE SECOND BREACH AND REPUDIATION (ON BEHALF OF ALL DEFENDANT)**

87. In March 2019, a member of the Crowe Group contacted Kevin Fleming on behalf of the Crowe

Group (including Susie Yee), with the following email (Exhibit E), attempting to purchase

Seaside Mariana, despite:

    a.   The non-circumvent this Defendant and the Crowe Group had agreed to.

    b.   The Funding Contract they had signed.

    c.   The various representations they made in October 2018, just before the parties would

        have closed, that they were pulling out and were no longer interested in the Seaside

        Mariana land.

**THE THIRD CROWE BREACH/REPUDIATION (ON BEHALF OF ALL CROWE GROUP)**

88. In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on

communications from Thomas Madden and David Crowe, in email, attempting to negotiate a

direct purchase of the SM company and land (without involving the Plaintiff).

89. In doing so, it is clear Crowe and Susie Yee fully ratified the first Crowe Group breach as well

as the second breach and repudiation (Madden contact of Fleming to try to buy direct) of the

Funding Contract.

**FURTHER RAMIFICATIONS OF THE CROWE GROUP BREACHES**

90. In and after March 2019, once members of the Crowe Group contacted Kevin Fleming to negotiate

with him directly, on behalf of the Crowe Group, and once David Crowe followed through and

continued those negotiations on behalf of all Crowe Group members and all Defendant, Kevin Fleming stopped returning the Plaintiff's phone calls.

91. (In December 2019, two months after Susie Yee and the Crowe Group pulled out of the Funding Contract at the 11ᵗʰ hour) Kevin Fleming emailed the Plaintiff to say he was terminating the Purchase Contract. However, Mr. Fleming did not have the legal right to do so).

92. Fleming refused to honor any of the rest of the Plaintiff's contracts with him or his entities.

93. As a result, the Plaintiff has potentially lost another US $3 million or more, as shall be further proven at trial (with US ~$2+ million of profits expected to come from the Isla Mariana / Nicaragua Developments deals). (The Plaintiff admits that these profits were speculative, and that from a legal standpoint, each expected potential profit must be multiplied by the percentage chance that the Plaintiff would have realized that particular profit. This, too, will occur at a jury trial expected in 2024).

94. The Plaintiff is doing what he can to mitigate the damages.


## **CONCLUSION**

95. The Defendant's breaches, repudiations, false promises, representations, and assurances, not to mention their tortious acts and non-acts, and their negligence have caused significant damages to Plaintiff, in an amount to be proven at trial.

96. The Plaintiff has worked to try to remedy the Defendant's breaches and to mitigate damages, but to no avail thus far.

97. The Plaintiff will continue to do his best to mitigate the base damages, especially his hoped-for and expected profits from purchasing the Seaside Mariana company (other than the US $334,000).

98. The Plaintiff contacted David Crowe of the Crowe Group to see if they could work something out, whether a way to move forward, or a settlement, but Mr. Crowe was not interested.

99. The Plaintiff has had similar discussions with Mr. Rau and Mr. Jimenez, with no interest by those parties in continuing a discussion about ways the Plaintiff can still close on the Seaside Mariana company (if that is even relevant or possible). Mr. Rau and Mr. Jimenez had no interest in that nor in any settlement discussions.

100. Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights. (Also, as per *Fed. R. Civ. P 38(b)*).

101. The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.

---

## Count I (A) – First Breach of Contract

102. The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

103. The Plaintiff entered in to contracts with Susie Yee including the Funding Contract.

104. The Defendant's refusal to close, and to fund the Plaintiff's purchase of the Seaside Mariana company (in October 2018), breached the Funding Contract.

105. As a direct and proximate result of the Defendant's breach, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

106. As a direct and proximate result of the Defendant's breach, the Plaintiff lost $334,000 in near term profits.

107. As a direct and proximate result of the Defendant's breach, the Plaintiff avers that he lost up to another US $4 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received. (The Plaintiff is attempting to mitigate these damages).

108. In the alternative, the Defendant's clear and unequivocal refusal to perform and fund the close was an express repudiation of the Funding Contract.

109. The Plaintiff will fully prove all his base damages at jury trial.

**Count I (B) – Second Breach of Contract**

110. The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

111. The Crowe Group's contacting Mr. Kevin Fleming in March 2019 to attempt to purchase the Seaside Mariana company and its land without the Plaintiff's involvement constituted a willful breach of the non-circumvent that had been agreed to and an independent willful breach of the Funding Contract, impliedly if not explicitly.

112. In the alternative, the Crowe Group's acts to contact Mr. Fleming and to circumvent the Plaintiff despite the Funding Contract and other agreements with the Plaintiff constituted a repudiation of the Funding Contract.

113.    Upon information and belief, David Crowe and his partners contacted Mr. Fleming with the knowledge and support of this Defendant.

114.    In the alternative, since this Defendant was all partners in the Litigating Group, with a partnership agreement governing that partnership, this Defendant (and their partnership) are all civilly responsible (and liable) for Mr. Madden's tortious acts in this context, via agency.

115.    As a direct and proximate result of this Defendant's breach of contract, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

116.    As a direct and proximate result of the Defendant's breach of contract, the Plaintiff lost US $334,000 in near term profits.

117.    As a direct and proximate result of the Defendant's breach of contract, the Plaintiff avers that he lost up to another US $4 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received. (The Plaintiff is attempting to mitigate these damages)

118.    In the alternative, the Crowe Group's contact of Fleming and attempt to purchase the SM company and land constituted an implied further repudiation of the Funding Contract.

119.    The Plaintiff will fully prove all his base damages in the jury trial.


**Count I (C) – Third Breach of Contract**


120.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

121.    David Crowe's April 2019 following up on the Crowe Group's contact of Mr. Kevin Fleming to negotiate the direct purchase of the Seaside Mariana company and its land without

the Plaintiff's involvement constituted a willful breach of the non-circumvent that had been

agreed to and an independent willful breach of the Funding Contract, impliedly if not explicitly.

122.    To the extent that this Defendant was not aware of Mr. Madden's March 2019 contact of

Mr. Fleming and/or did not endorse it then, the April 2019 contact and negotiations also served

as a ratification of contact of Mr. Fleming by the Crowe Group, to attempt to circumvent the

Plaintiff despite the terms of the Funding Contract.

123.    Mr. Crowe's April 2019 contact with Mr. Fleming and attempt to purchase the SM company

and land directly also constituted another repudiation of the Funding Contract.

124.    Upon information and belief, Mr. Crowe negotiated with Mr. Fleming with the knowledge

and support of the rest of this Defendant.

125.    In the alternative, since this Defendant was all partners in the Litigating Group, with a

partnership agreement governing that partnership, this Defendant (and their partnership) are all

civilly responsible (and liable) for Mr. Crowe's tortious acts in this context, via agency.

126.    Mr. Crowe contacted Mr. Fleming and attempted to negotiate the direct purchase of Seaside

Mariana on behalf of this Defendant and the Litigating Group.

127.    As a direct and proximate result of this Defendant's breach of contract, the Plaintiff lost an

asset he would have owned, the Seaside Mariana company.

128.    As a direct and proximate result of the Defendant's breach of contract, the Plaintiff lost US

$334,000 in near term profits.

129.    As a direct and proximate result of the Defendant's breach, the Plaintiff avers that he lost up

to another US $4 million (post-tax) in the medium term (within approximately nine months of

the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages)

130.    In the alternative, Crowe's contact with Fleming and attempt to directly purchase the SM company and land constituted a further repudiation of the Funding Contract.

131.    The Plaintiff will fully prove all his base damages in the jury trial.

## Count II – Promissory Fraud

132.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

133.    Pleading alternatively, this Defendant and their partners (the Crowe Group) never intended to close on the Funding Contract.

134.    As one plausible explanation for said behavior, the Crowe Group, long-term adversaries of Fleming, planned to use the Plaintiff's efforts to discover valuable strategic information concerning Fleming's resources, price-points, and confidential plans (collectively "Fleming's Trade Secrets").

135.    As another plausible and not mutually exclusive explanation for said behavior, this Defendant was wealthy investors who could afford (as Mr. Jimenez did) to invest US $700,000 for the land alone for a second residence in a foreign country.  However, this Defendant did not have expertise in real estate development and Latin American title issues (though Mr. Rau sells property for a real estate developer).  This Defendant, who had already previously attempted to purchase the SM land, planned to discover valuable strategic information concerning the Plaintiff's strategy to monetize the SM company and/or its land, as well as the deal points of the

Plaintiff's deal, which appeared to be at a million dollar plus lower price point than this Defendant had been able to negotiate (collectively "Wescott's Trade Secrets").

136.    Susie Yee' partners David Crowe and Mike Lyonette made verbal promises to the Plaintiff, later codified in writing in the Funding Contract, that they would fund Plaintiff's purchase of the SM land (the "Litigators' Promises").

137.    Via David Crowe and Mike Lyonette, further verbal promises were made, also later codified in writing, that the Litigating Group – including Susie Yee - would also fund Plaintiff's purchase of the SM land (the "Litigating Group's Promises").

138.    The Defendant's promises to close on the Funding Contract and to fund Plaintiff's purchase of the Seaside Mariana company ("the Litigators' Promises" and "the Litigating Group's Promises") were false when made, as part of a scheme.

139.    Upon information and belief, one part of the scheme was the attempt to induce the Plaintiff to uncover and communicate Fleming's Trade Secrets which this Defendant in turn planned to misuse in a series of further strategic moves, in and out of Court.

140.    Upon information and belief, another part of the scheme was the attempt to induce the Plaintiff to share Plaintiff's Trade Secrets which this Defendant also planned to misuse.

141.    This Defendant intended that the Plaintiff rely on "the Litigators' Promises".

142.    This Defendant further intended that the Plaintiff rely on "the Litigating Group's Promises".

143.    In the non-exclusive alternative, this Defendant intended that the Plaintiff rely on "the Litigating Group's Promises".

144.    The Plaintiff did in fact reasonably rely on the Litigators' Promises as well as the Litigating Group's Promises (collectively, "Both Sets of Promises"), as demonstrated by the facts that the

Plaintiff signed the Funding Contract and committed to the Litigators and the Litigating Group as his source for the funding for the Plaintiff's purchase of the Seaside Mariana company.

145.    The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

146.    As a result, the Plaintiff was damaged.

147.    This Defendant and the Litigating Group also did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

148.    As a result, the Plaintiff was damaged.

149.    The Plaintiff was damaged by his reliance on Both Sets of Promises by losing an asset he would have owned, the Seaside Mariana company.

150.    The Plaintiff was further damaged by his reliance on Both Sets of Promises by losing $334,00 in near term profits.

151.    The Plaintiff was even further damaged by his reliance on Both Sets of Promises by losing up to another US $4 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages; this Defendant have rejected any notion of mitigating these damages thus far).

152.    The Plaintiff's reliance on Both Sets of Promises was a substantial factor in the Plaintiff being damaged (as per the three main sets of base damages outlined above).

153.    The Plaintiff will fully prove all his base damages at jury trial.


**Count III – Promissory Estoppel**

24

154.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

155.    Susie Yee' David Crowe and Mike Lyonette made verbal promises to the Plaintiff, later codified in writing in the Funding Contract, that they would fund Plaintiff's purchase of the SM land (the "Litigators' Promises").

156.    Via David Crowe and Mike Lyonette, further verbal promises were made, also later codified in writing, that the Litigating Group – including Susie Yee - would also fund Plaintiff's purchase of the SM land (the "Litigating Group's Promises").

157.    The Litigators reasonably expected that their promises would induce action on the part of the Plaintiff, expecting that the Plaintiff would first sign and commit to the Funding Contract, and then that the Plaintiff would do some of the Litigators' due diligence for them, and then that the Plaintiff might reveal to the Litigators Fleming's Trade Secrets and/or Wescott's Trade Secrets.

158.    In the non-exclusive alternative, the Litigators reasonably expected that their promises would induce forbearance on the part of the Plaintiff, expecting that the Plaintiff would not source another investor to fund his purchase of the Seaside Mariana company.

159.    The Litigating Group reasonably expected that their promises would induce action on the part of the Plaintiff, expecting that the Plaintiff would first sign and commit to the Funding Contract, and then that the Plaintiff would do some of the Litigators' due diligence for them, and then that the Plaintiff might reveal to the Litigators Fleming's Trade Secrets and/or Wescott's Trade Secrets.

160.    In the non-exclusive alternative, the Litigating Group reasonably expected that their promises would induce forbearance on the part of the Plaintiff, expecting that the Plaintiff would not source another investor to fund his purchase of the Seaside Mariana company.

161.    Both Sets of Promises did in fact reasonably induce the expected actions on the part of the Plaintiff, as the Plaintiff relied on those promises to his detriment.

162.    Both Sets of Promises did in fact reasonably induce the expected forbearance on the part of the Plaintiff, too, as the Plaintiff relied on those promises to fund to his detriment.

163.    Injustice could only have been avoided by enforcement of the promises.

164.    The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

165.    As a result, the Plaintiff was damaged.

166.    This Defendant and the Litigating Group also did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

167.    As a result, the Plaintiff was damaged.

168.    The Plaintiff was damaged by his detrimental reliance on Both Sets of Promises by losing an asset he would have owned, the Seaside Mariana company.

169.    The Plaintiff was further damaged by his detrimental reliance on Both Sets of Promises by losing $334,00 in near term profits.

170.    The Plaintiff was even further damaged by his detrimental reliance on Both Sets of Promises by losing up to another US $4 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The

1    Plaintiff is attempting to mitigate these damages; this Defendant have rejected any notion of

2    mitigating these damages thus far).

3    171.    The Plaintiff will fully prove all his base damages at jury trial.

4

5

6                    **Count IV – Negligent Misrepresentation**

7

8    172.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

9    173.    Susie Yee' partners David Crowe and Mike Lyonette made verbal representations to the

10    Plaintiff, later codified in writing in the Funding Contract, that they would fund Plaintiff's

11    purchase of the SM company (the "Litigators' Representations").

12    174.    Via David Crowe and Mike Lyonette, further verbal representations were made, also later

13    codified in writing, that the Litigating Group would fund Plaintiff's purchase of the SM

14    company (the "Litigating Group's Representations").

15

16    175.    Collectively, both sets of Representations shall be known as Both Sets of Representations.

17    176.    Pleading in the non-exclusive alternative, at the time David Crowe and Mike Lyonette made

18    Both Sets of Representations, Mr. Crowe and Mr. Lyonette were acting in their professional

19    capacities and had pecuniary interests in the underlying transaction.

20

21    177.    Mr. Crowe failed to exercise due care in making Both Sets of Representations that the

22    Litigators would fund the Plaintiff's purchase of the SM company, and that the Litigating Group

23    would fund the Plaintiff's purchase of the SM company.

24

25

26                                27

178. Mr. Lyonette failed to exercise due care in making Both Sets of Representations that the Litigators would fund the Plaintiff's purchase of the SM company, and that the Litigating Group would fund the Plaintiff's purchase of the SM company.

179. The Plaintiff justifiably relied on the Litigators' representations.

180. The Plaintiff justifiably relied on the Litigating Group's representations.

181. The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company (as they had represented), pulling out of the deal a couple days before the scheduled closing. As a result, the Plaintiff was damaged.

182. This Defendant and the Litigating Group also did not fund the Plaintiff's purchase of the Seaside Mariana company (as they had represented), pulling out of the deal a couple days before the scheduled closing. As a result, the Plaintiff was damaged.

183. The Plaintiff was damaged by his reliance on Litigators' representations by losing an asset he would have owned, the Seaside Mariana company.

184. The Plaintiff was further damaged by his reliance on Litigators' representations by losing $334,00 in near term profits.

185. The Plaintiff was further damaged by his reliance on Litigators' representations by losing up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received. (The Plaintiff is attempting to mitigate these damages, whereas the Litigators have rejected any notion of mitigating these damages thus far).

186. The Plaintiff was damaged by his reliance on the Litigating Group's representations, as well, by losing an asset he would have owned, the Seaside Mariana company.

187.    The Plaintiff was further damaged by his reliance on the Litigating Group's representations by losing $334,00 in near term profits.

188.    The Plaintiff was further damaged by his reliance on the Litigating Group's representations by losing up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages)

189.    This Defendant are liable via agency.

190.    Conjunctively and alternatively, this Defendant also ratified Mr. Crowe and Mr. Lyonette and the Crowe Groups relevant acts and non-acts.

191.    The Plaintiff will fully prove all his base damages at jury trial.

### Count V – Tortious Interference with Contractual Relations

192.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

193.    At all relevant times, the Plaintiff was in an economically advantageous relationship with Fleming ("the Relationship") that was likely to confer substantial benefits, especially given the parties' complimentary expertise and interest in Central American development.

194.    Indeed, the Plaintiff had entered into numerous other contracts ("the Other Related Contracts) to purchase assets, companies, land, and legal claims from Fleming, his wife Maria Rueda, and eight more of their companies.

195.    The Plaintiff was also working on a deal with the Jamaican government.

196.    The Defendant was aware of the Relationship and the Other Related Contracts and the Jamaican government deal both generally and specifically.

197.    The Plaintiff had made David Crowe, agent and communicator for the other Defendant, specifically aware of the contracts and what he expected to make on them, and thus, this Defendant had constructive notice of such.

198.    The Plaintiff also revealed to Mr. Crowe, and thus all this Defendant (constructive notice), in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

128. This Defendant was aware, or should have been aware, that their refusal to close on the Funding Contract, and this Defendant's refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

129. This Defendant was also aware, or should have been aware, that their refusal to fund the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's other contracts to purchase the rest of the assets of Fleming, Rueda, Grupo Mariana, and Nicaragua Developments, including eight more companies, in two ways: (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close his purchases as outlined in the Other Related Contracts.

130. The Defendant's refusal to honor the Funding Contract foreseeably and substantially interfered with and disrupted the Relationship.

131. The Defendant's refusal to honor the Funding Contract foreseeably and substantially interfered with the Plaintiff's ability to perform on the Other Related Contracts, and thus interfered with the Other Related Contracts, too.

132. The Plaintiff was harmed by the Defendant's intentional acts of interference with the Relationship by the consequential loss of profits in the Other Related Contracts and in future Central American transactions with Fleming and his associates.

133. The Plaintiff was harmed by the Defendant's intentional acts of interference with his ability to perform as outlined in the Other Related Contracts and in future Central American transactions with Fleming and his associates.

134. The Plaintiff was therefore harmed by the Defendant's intentional acts of interference with the Other Related Contracts themselves.

**Count VI – Negligent Interference with Contractual Relations**

199.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

200.    Pleading in the non-exclusive alternative, at all relevant times, the Plaintiff was in an economically advantageous relationship with Fleming ("the Relationship") that was likely to confer substantial benefits, especially given the parties' complimentary expertise and interest in Central American development.

201.    Indeed, the Plaintiff had executed numerous other contracts ("the Other Related Contracts) to purchase assets, companies, land, and legal claims from Fleming, his wife Maria Rueda, and eight more of their companies.

202.    The Plaintiff was also working on a deal with the Jamaican government.

203.    The Defendant was aware of the Relationship and the Other Related Contracts and the Jamaican government deal both generally and specifically.

204.    The Plaintiff had made David Crowe, agent and communicator for (and partner to) the other Defendant, specifically aware of the contracts and what he expected to make on them. Thus, this Defendant had constructive notice, and either were aware, or should have been aware.

205.    The Plaintiff also revealed to Mr. Crowe, and thus all of these related Defendants (including Ms. Yee), in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

206.    The sum total of all of the Plaintiff's expected or prospective revenue and profits from the Relationship, the Other Related Contracts, and the Jamaican government deal shall be referred to as the "Plaintiff's Contractual Relations."

207.    The Defendant was aware or should have been aware of the Relationship both generally and specifically, as well as the Plaintiff's Contractual Relations.

208.    The Defendant knew that the Relationship and the Plaintiff's Contractual Relations would be disrupted if they failed to act with due care.

209.    The Defendant was aware, or should have been aware, that their refusal to close on the Funding Contract, and this Defendant's refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

210.    This Defendant was also aware, or should have been aware, that their not funding the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's other contracts relations, including his contracts to purchase the rest of the assets of Fleming, Rueda, Grupo Mariana, and Nicaragua Developments, including eight more companies, in two ways: (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close perform for these and other Plaintiff Contractual Relations.

211.    By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, this Defendant (and their partners) failed to act with due care and substantially interfered with and disrupted the Relationship.

212.    By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, this Defendant further failed to act with due care and substantially interfered with and disrupted the Plaintiff's Contractual Relations.

213.    The Plaintiff was harmed by the Defendant's (and their partners') acts of negligent interference with the Relationship and the Plaintiff's Contractual Relations by the consequential loss of profits in the other transactions and contracts Plaintiff had formed with Fleming, his

wife, and his companies, as well as other opportunities that the Plaintiff likely would have benefited from based on the Relationship.

214.    The Plaintiff shall prove the amounts of these base damages at jury trial.

**Count VII Intentional Interference with Prospective Economic Advantage**

215.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

216.    At all relevant times, the Plaintiff was in an economically advantageous relationship with Mr. Kevin Fleming ("the Relationship"). Indeed, the Plaintiff expected specific economic advantages that were already encapsulated in numerous other contracts the Plaintiff had already executed with Fleming and related parties ("the Other Related Contracts")

217.    At all relevant times, the Plaintiff's economically advantageous relationship with Fleming ("the Relationship") was likely to confer further substantial benefits especially given the parties' complementary expertise and interest in Central American development.

218.    The Plaintiff was also working on a deal with the Jamaican government.

219.    The sum total of all of the Plaintiff's expected or prospective economic advantages from the Relationship and from the positive economic force from his purchase of the Seaside Mariana company shall be referred to as the "Plaintiff's Prospective Economic Advantages."

220.    The Defendant was aware or should have been aware of the Relationship both generally and specifically, as well as the Plaintiff's Prospective Economic Advantages.

221.    The Plaintiff had made David Crowe, agent and communicator for the other Defendant, specifically aware of the contracts and what he expected to make on them. Hence, this Defendant had constructive notice of such.

222.    The Plaintiff also revealed to Mr. Crowe, and thus all this Defendant, in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

223.    The Defendant was aware that their refusal to honor the Funding Contract and this Defendant's refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

224.    Indeed, this Defendant's refusal to fund the Plaintiff's purchase of the Seaside Mariana company did burden the Relationship.

225.    This Defendant was also aware, or should have been aware, that their refusal to fund the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's Prospective Economic Advantages: (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close his purchases in the Other Related Contracts, nor finalize and execute his deal in Jamaica.

226.    The Defendant's refusal to honor the Funding Contract foreseeably and substantially interfered with and disrupted the Relationship.

227.    The Defendant's refusal to honor the Funding Contract foreseeably and substantially interfered with the Plaintiff's Prospective Economic Advantages.

228.    The Plaintiff was harmed by the Defendant's intentional acts of interference with the Relationship by the consequential loss of revenue and profits.

229.    The Plaintiff was harmed by the Defendant's intentional acts of interference with his ability to perform in the Other Related Contracts and in his Jamaican deal.

230.    The Plaintiff was harmed by the Defendant's intentionally interfering with the Relationship and with the Plaintiff's Prospective Economic Advantages by the consequential loss of profits in the other transactions and contracts Plaintiff had formed with Fleming, his wife, and his companies, as well as other opportunities that the Plaintiff likely would have benefited from based on the Relationship.

231.    The Plaintiff shall prove the amounts of these base damages at jury trial.


## Count VIII Negligent Interference with Prospective Economic Advantage


232.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

233.    At all relevant times, the Plaintiff was in an economically advantageous relationship with Mr. Kevin Fleming ("the Relationship").  Indeed, the Plaintiff expected specific economic advantages that were already encapsulated in numerous other contracts the Plaintiff had already executed with Fleming and related parties ("the Other Related Contracts")

234.    At all relevant times, the Plaintiff's economically advantageous relationship with Fleming ("the Relationship") was likely to confer further substantial benefits especially given the parties' complementary expertise and interest in Central American development.

235.    The sum total of all of the Plaintiff's expected or prospective economic advantages from the Relationship shall be referred to as the "Plaintiff's Prospective Economic Advantages."

1    236.    The Defendant was aware or should have been aware of the Relationship both generally and

2    specifically, as well as the Plaintiff's Prospective Economic Advantages

3    237.    The Defendant knew that the Relationship and the Plaintiff's Prospective Economic

4    Advantages would be disrupted if they failed to act with due care.

5

6    238.    By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase

7    of the Seaside Mariana company, this Defendant failed to act with due care and substantially

8    interfered with and disrupted the Relationship.

9    239.    By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase

10    of the Seaside Mariana company, this Defendant further failed to act with due care and

11    substantially interfered with and disrupted the Plaintiff's Prospective Economic Advantages.

12    240.    The Plaintiff was harmed by the Defendant's acts of negligent interference with the

13    Relationship by the consequential loss of profits in the other transactions and contracts Plaintiff

14    had formed with Fleming, his wife, and his companies, as well as other opportunities that the

15    Plaintiff likely would have benefited from based on the Relationship.

16

17    241.    The Plaintiff shall prove the amounts of these base damages at jury trial.

18

19    **Count IX – Breach of the Covenant of Good Faith and Fair Dealing**

20

21

22    242.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

23    243.    The Plaintiff entered in to contracts with this Defendant including the Funding Contract.

24    244.    The Plaintiff performed all conditions required of him by the contract.

25    245.    The Defendant interfered with the Plaintiff's right to receive the benefits of the contract.

26

246.    As a direct and proximate result of the Defendant's breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

247.    As a further direct and proximate result of the Defendant's breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost $334,000 in near term profits.

248.    As a direct and proximate result of the Defendant's breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost up to another US $4 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages; this Defendant have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

249.    The Plaintiff will fully prove all his base damages at jury trial.

### Count X – Negligent Infliction of Emotional Distress

250.    The Plaintiff realleges paragraphs 1-101 as if fully set out herein.

251.    This Defendant owed the Plaintiff contractual duties as well as a fiduciary duty to honor the contract and fund the Plaintiff's purchase of the Seaside Mariana.

252.    This Defendant breached their duties, resulting in enormous damages to the Plaintiff.

253.    The situation was especially traumatic to the Plaintiff as he had been mired in abject poverty for years, and thus, closing on his purchase of the Seaside Mariana company

1    represented the solution to most of the Plaintiff's major life issues.

2    254.    As one example of the ramifications, the Plaintiff had not paid substantial Child Support

3    since 2014 and had not seen his children.

4    255.    The Plaintiff planned to make significant Child Support payments and also hire an attorney

5    So he could see his children, once this Defendant honored their obligations.

6

7    256.    For this Defendant to pull out of the funding and closing almost at the closing table was

8    especially emotionally devastating to the Plaintiff, given his hopes and dreams.

9    257.    This Defendant's breaches of duty therefore foreseeably inflicted extreme

10    emotional distress on the Plaintiff.

11    258.    This Defendant's breaches of duty were the proximate cause of the Plaintiff's emotional

12    distress.

1    WHEREFORE, Plaintiff prays

2        (a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate

3            result of the Defendant's breach of contract;

4        (b) As to Count II for all direct and consequential damages the Plaintiff incurred as a

5            proximate result of David Crowe's (and this Defendant's) promissory fraud along with the

6            imposition of exemplary damages to deter the Defendant from committing such acts of

7            fraud in the future;

8

9        (c) As to Count III for all direct and consequential damages the Plaintiff incurred as a

10           proximate result of David Crowe's (and this Defendant's) promissory estoppel along with

11           the imposition of exemplary damages to deter the Defendant from committing such acts

12           in the future;

13

14       (d) As to Count IV for all direct and consequential damages the Plaintiff incurred as a

15           proximate result of Crowe's negligent misrepresentations along with the imposition of

16           exemplary damages to deter Defendant Yee from committing such acts in the future.

17       (e) As to Count V for an award of damages sufficient to compensate the Plaintiff for all direct

18           and consequential damages caused by the Defendant's tortious interference with the

19           Plaintiff's contractual relations as well as the imposition of exemplary damages in an

20           amount sufficient to punish and deter the Defendant from committing similar acts of

21           interference in the future.

22

23       (f) As to Count VI for an award of damages sufficient to compensate the Plaintiff for all direct

24           and consequential damages caused by the Defendant's negligent interference with the

25           Plaintiff's contractual relations.

26

                                        40

(g) As to Count VII for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendant's intentional interference with the Plaintiff's prospective economic advantages as well as the imposition of exemplary damages in an amount sufficient to punish and deter the Defendant from committing similar acts of interference in the future.

(h) As to Count VIII for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendant's negligent interference with the Plaintiff's prospective economic advantages.

(i) As to Count IX for an award of damages, in an amount sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendant's breach of the covenant of good faith and fair dealing and for the imposition of exemplary damages in an amount sufficient to punish and deter the Defendant from engaging in acts of bad faith in the future.

(j) As to Count X, for an award of all damages proximately caused by the Defendant's negligent infliction of emotional distress.

(k) For all costs of suit, including fees, paralegal costs, costs of travel, future attorneys' fees, and reasonable compensation for the Plaintiff's time while representing himself.

(l) For such other and further relief as the Court deems just.

RESPECTFULLY SUBMITTED on January 24th, 2022

CARL A. WESCOTT, *pro se*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Case Summary

### (Exhibit C)

By way of background and factual narrative, the case at bar arises from a breach of a contract in which a group of 20 investors and two associated parties had agreed to purchase approximately 923 acres of beach land from the Plaintiff. In 2018, the Plaintiff had locked up the purchase of a failed residential development called Seaside Mariana that had originally paid US $4 million for the same land, raw, years ago. The Plaintiff's contract called for payments of US $500,000 total to purchase the company that owned the Seaside Mariana land, with US $25,000 to be paid after the Plaintiff had completed his due diligence, and the other US $475,000 to be paid at the closing, within 60 days of the completion of due diligence.

The Plaintiff, however, did not have the cash to make the purchase, but he also did not want the land owned by the company, valuable though it may be in the right hands. (With the permits in place for a residential subdivision with more than 1000 residential lots on the 923 acres, and a completed subdivision, the land, in the hands of a developer with capital to put in the infrastructure for that residential subdivision, would likely appraise for over US $10,000,000 and could generate tens of millions in residential lot sales). The Plaintiff was purchasing the company that owned the failed development for other intangible assets that it owned. That company had and still has title insurance policies that could be monetized to the tune of US $8 million, tax-free (as the company had already lost over US $8 million due to title fraud and other issues covered by the title insurance policies). Like most of the population, the owners of the Seaside Mariana company did not fully understand the title insurance policies that they held, nor how to monetize them. The company also had over US $22 million in liabilities, all unsecured (because it had sold a small portion of the

**CASE SUMMARY**

residential lots to 50+ people and collected US $22 million from them, but then never put in the infrastructure nor delivered fee simple title to the great majority of those 50+ people).

Lacking the $500,000 needed at the closing to purchase the company that owned the failed development, and frankly, lacking even the $25k due after his completed due diligence, the Plaintiff approached a group of investors that he knew were familiar with the land and wanted it. A group of 20 individuals (a subset of the 50+ people that had purchased within Seaside Mariana) had banded together to sue Kevin Fleming and his Seaside Mariana company, because they had paid millions of dollars to Kevin's company with promises of roads, electricity, security, septic, lights, and other infrastructure for the residential development. Those investors were also promised a Jack Nicklaus-designed golf course, a Wyndham hotel, condos, and other significant amenities, as well as title to the beach lots, residential lots on the golf course, and, in some cases, condominiums.

The promised infrastructure never materialized, and the investors, many of whom thought of retiring on that very same beach, did not get their lots. The Plaintiff had approached the leader of this group of investors, Mr. David Crowe, who had organized the investors together for the litigation. The group was informally known as the "Crowe Group", and the Plaintiff has adopted that vernacular. Another leader of the group of 20+ investors who had banded together was and is Mr. Michael Lyonette, who had loaned seven-digit amounts to Mr. Fleming and the Seaside Mariana company. In Mr. Lyonette's case, his loans were secured by first mortgages on neighboring land that had been carved out for the loans, but Mr. Lyonette had also paid for lots from Seaside Mariana and not received them.

The Plaintiff approached Mr. David Crowe and they worked out a deal, where Mr. Crowe and his group of investors would fund the US $500,000 for the Plaintiff's purchase of the Seaside Mariana company, including the US $25,000 that the Plaintiff would need to send to Kevin Fleming

**CASE SUMMARY**

2

(the main original owner of Seaside Mariana). Those same investors had previously worked out a deal (that later fell apart) to pay $1.5 million for the same land, and the Plaintiff offered them a much better deal that they accepted, where the investors would essentially be paying US $834,000 for the same land – the US $500,000 the Plaintiff needed for the purchase, plus another US $334,000 for the Plaintiff and one of his entities. Mr. Crowe agreed to a NCND (including a non-circumvent) on behalf of the group, given that the Plaintiff had the purchase of the Seaside Mariana company and land locked up in an enforceable contract.

That was the original contract between the Plaintiff and the Crowe Group, the group of twenty investors and two associates. After the Plaintiff and the Crowe Group had completed their due diligence (in August 2018) to confirm everything about Seaside Mariana was as expected (ownership, fee simple title, no secured debt on the land), the Crowe Group provided the US $25,000 for the Plaintiff to pass through to Mr. Fleming, as per the Plaintiff's contract with Mr. Fleming and the other owners of the Seaside Mariana company (Grupo Mariana and Maria Rueda).

At that point, in August 2018, the Plaintiff signed a new contract with the Crowe Group, in which the Crowe Group committed to closing within sixty (60) days and funding the other $475,000 that the Plaintiff needed to purchase the Seaside Mariana company. Notably, as the Crowe Group had completed its due diligence, there were no contingencies for the Crowe Group to pull out for any reasons. Thus, the twenty-two members of the Crowe Group partnership were committed to funding the US $475,000 for the Plaintiff to purchase the Seaside Mariana company, and then after the Plaintiff transferred the land to the Crowe Group (intended for immediately after closing in a "simultaneous close"), then US $334,000 more to the Plaintiff and his entity in quarterly payments during 2019 and part of 2020. (The contract was included in the original legal complaint filing).

**CASE SUMMARY**

Everything was progressing smoothly towards the close, with the parties agreeing on various details, hiring attorneys, and setting a close date in mid-October 2018. However, just a couple days before the close, just before the Plaintiff was going to fly in for the closing, David Crowe informed the Plaintiff, on behalf of the Crowe Group, that they were pulling out of the deal and would not fund or close. Later, in mid-March 2019, despite the contractual agreement with the Plaintiff, and despite the non-circumvent agreed to, one of the members of the Crowe Group contacted Kevin Fleming and tried to purchase (on behalf of the group) the Seaside Mariana land directly, as a further repudiation of the contract with the Plaintiff.

In May 2020, the Plaintiff sued the twenty-two members of the Crowe Group in Maricopa County (as the original contract had a forum selection clause of Phoenix, Arizona), for various causes of action including breach of contract. The Plaintiff served all of the Crowe Group members that he could track down, and ten (10) of them that had been served and/or appeared filed a Notice of Removal to United States District Court in the District of Arizona. The Plaintiff then settled with a few of the Defendants. Because the final August 2018 contract had a forum selection clause of San Francisco, California, the remaining Defendants requested a change of venue to this Court.

The Plaintiff considered his monetization of the title insurance policies a trade secret. At least seven of the Crowe Group defendants – the ones who were most committed to funding the Plaintiff's purchase within the greater group – signed Non-Disclosure Agreements with the Plaintiff, in which they agreed not to disclose any aspects of the Plaintiff's contract and plans to third parties, and also agreed that a breach could cause over US $10 million of base damages.

**CASE SUMMARY**

4



This Settlement Agreement dated as of August 11th, 2018, is entered into by and among:

### "THE SETTLER"

Carl (aka Kalle) Wescott

And

### "THE LITIGATORS"

### RECITALS

Between the undersigned, to wit: On one hand, Kalle Wescott (hereafter called the "Settler") and on the other hand, David Crowe and Mike Lyonette (hereafter called "The Litigators"). Mike Lyonette ("the Mortgage Holder") previously provided loans to Seaside Mariana, and has a mortgage (hipoteca) on a subset of the Seaside Mariana land. The Litigators are part of the Litigating Group, which is a group of persons, represented by Federico A. Gurdián Sacasa (attorney-at-law), who bought or invested in lots, condominiums and bungalows at Seaside Mariana (hereafter called the "*Litigating Group*") that have a Nicaraguan lawsuit together have agreed to execute a legally-binding Settlement Agreement, (hereafter called the "Agreement").

**WHEREAS,** the Settler is currently purchasing 100% of the shares of Seaside Mariana Spa & Golf Resort S.A. (hereafter "SM" or "Seaside Mariana"), which is all ten thousand (10,000) shares, (hereafter called the "Stock"),

**WHEREAS,** the Parties (the Litigators and the Settler) wish to settle all claims of the Litigating Group and have agreed-upon terms to do so;



**WHEREAS,** the Parties (the Litigators and the Settler) hereby define three terms: "SM Closing" shall be when the Settler owns SM and has all the endorsed shares. "Land Closing" shall be when the Settler has transferred the SM land and the Horizontal Property Regime that is the major asset of the settlement to the Litigating Group or to the entity of their choice. "Full Settlement Closing" shall be when this Settlement is fully effectuated, including all items in Article I, sections 4 through 7 having been paid and transferred.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises made by the Parties hereto, covenant and agree as follows:

### Article I

1. When the Litigators have completed basic due diligence, the Litigators shall pay a non-refundable deposit of **Twenty-Five Thousand United States Dollars 00/100 (USD $25,000.00)** to a party designated by the Settler. This must occur by August 13th, 2018 or else this contract unwinds, with parties still respecting signed NDA agreements.

2. In the next 30 days, the Settler will sign a new agreement with the Litigating Group (as opposed to the Litigators), which will bind members of the group, which will further clarify the power of attorney(s) that Settler shall be providing, breaches of contract, that Settler does not personally owe monies owed to the Mortgage Holder and remedies and/or damages for the breaches.

3. The Parties shall have up to 60 days from now to close the settlement – through October 10th, 2018.

4. The high level terms of the settlement are that the Litigating Group will be providing US $834,000 in 4 tranches to the Settler, as further detailed below, while the Settler will be transferring to the Litigating Group almost all assets owned by Seaside Mariana, including all unencumbered lands, operating assets (including all tangible and almost all intangible assets), domains, web content, equipment, leases, contract rights, intellectual property rights used in the business of Seaside Mariana, together with all documents and entities relating to the HOA. Once all monies and land (along with the assets identified in Article I, section 6) have properly changed hands, the Parties shall indemnify each other by mutual agreement.

5. One of two exceptions to the transfers that are occurring as set out in Article I, section 4, is that Seaside Mariana will retain insurance policies and any other intangible asset that is either not transferrable, or for the benefit of SM only, or both.

6. The second of two exceptions concerns customer and mailing lists and mailing campaigns. The Settler shall be transferring to the Litigating Group all customer and prospect mailing lists (including all contact information) and mailing campaigns, both digital and analog (email, web, and snailmail). However, the parties shall co-own these assets. Settler shall assign his part of the co-ownership to a Sociedad Anonima after the close.

7. The $834,000 consists of four parts: (1) the $25,000 by August 10th, 2018; (2) $475,000 within 60 days of the first tranche, to be transferred to the named party of Settler's choice only after SM Closing, with Settler having full ownership of, and authority over, Seaside Mariana; (3) $234,000 as follows, to the Settler: $56,000 at the Land Closing when Litigating Group receive all their expected land as settlement, and 20% of SM land sales achieved by Litigating Group until fully paid, with a minimum of $12,000 per quarter (3 months), paid within a week or so of the end of each quarter, with the first payment beginning at the end of the second quarter after SM Closing, and then a quarterly payment every 3 months from that point onwards until the $234,000 has been paid in full and (4) then, another $100,000 to an entity of the Settler to be formed later. After the $234,000 to Settler has been paid, the Litigating Group shall continue to pay under the same quarterly program (20% of sales, but a minimum of $12,000 per quarter) to the entity until the $100,000 is fully paid.

8. These (Article I, sections 4 through 7) are the only sums and items owed to each other, and when fully transferred and paid the parties shall fully release liability to each other with regard to Seaside Mariana.

9. SM has not filed taxes since 2011, and thus Settler will work with the current owner to get all taxes filed and current through the tax year that ends June 2018. This is a necessity prior to any closing including SM Closing.

10. The Settler has bound the sellers of SM in a contract that ensures that Settler and the Litigating Group will get everything they need by or at closing, including the filed taxes. The Litigators have approved the language of this Closing Contract.

11. The Settler shall pay the costs related to the SM stock transfer. The Litigating Group shall pay the costs of the land transfer including what's necessary on property taxes to do the transfers. The parties shall pay their own attorneys.

12. The one sub-parcel that will not go to the Litigating Group is the parcel with a mortgage provided by one of the Litigating Group (the "Mortgage Holder"), also represented by Federico A. Gurdián Sacasa (attorney-at-law), unless it is most efficient to transfer it in bulk with the other land for the Litigating Group and then to the Mortgage Holder. At or just after the SM Closing, Settler shall work with the Mortgage Holder to transfer that land to the Mortgage Holder at the Mortgage Holder's expense.

13. Both Parties have entered this deal in good faith and with a lot of trust, but the Parties have offered each other mechanisms such that they do not have to rely solely on trust at each step. The Parties will work out the final details of each such step to their mutual satisfaction at each step. For example, because the $475,000 needs to go in to escrow prior to land transfer, the Settler has offered and will continue to offer any mechanism the Litigating Group desire to ensure that they will get the land, including issue by Settler of an irrevocable power of attorney to a Nicaragua attorney of the Litigating Group' choice. For the payments that will come with sales or paid each quarter, Settler does not necessarily require a mortgage on SM, and is open to Personally Guaranteed Promissory Notes.

14. Settler will continue to provide all due diligence information requested by Litigating Group, and can provide a complete package of written documents at or just after the close.

15. Confidentiality is extremely important to complete this settlement, including the purchase aspect. The Settler has already executed NDAs (Non-Disclosure Agreements) with the Litigators. The Litigators plan to solicit funding from several more members of the group of Litigating Group. The Litigators shall ensure that those several members, as well as Federico A. Gurdián Sacasa, all sign NDAs with the Settler similar to the one provided by the Settler on Saturday August 4th, 2018, prior to disclosing information related to this settlement or other confidential information. Subsequently, all confidential information and all information relating to this deal shall be shared ONLY with the Settler, the Litigators, Senor Gurdián, and the members of the Litigating Group that have signed NDAs in the past week or that shall sign NDAs shortly.

16. Settler already has digital files of the following categories and these will be provided to Litigating Group prior to closing:   Legal, Financials, Sales, Vendors, Marketing, Engineering and Design, Permits, Employees, HOA documentation and entities, Communication, Maps, Cash Liabilities, Contractual Liabilities, Pictures and Digital Collateral. Settler shall transfer all of these to the Litigating Group prior to SM Closing.

17. Ownership of the land: Except for the registered mortgage lien held by Mortgage Holder on the lots identified, Settler represents and warrants (a) that Seaside Mariana Spa & Golf Resort S.A. has clear and unencumbered title[1] to all of the aforementioned lands and (b) that, once Settler's acquisition of Seaside Mariana has been finalized (aka SM Closing), Settler will be in a position to fully execute and deliver on all of the agreements and obligations set out in this Settlement Agreement. The Parties attach the most recent Libertad de Gravamen for the lands as Exhibit A. The Libertad de Gravamen shows property that is formally Registered and thus not able to be transferred to Litigating Group.

18. Liabilities of Seaside Mariana: Settler represents and warrants that, except for the liabilities to the Litigation Group members settled by this Agreement, all existing liabilities of Seaside Mariana, including Seaside Mariana's obligation to deliver 10 Beach Front lots to a previous shareholder of Seaside Mariana, remain with the Seaside Mariana entities owned by Settler and shall not pass to Claimants or to the Litigation Group. Settler shall indemnify the Litigation Group and its members against any such claims that may arise from these obligations.

19. Settler shall ensure

    (1) that the current beneficial owners of Seaside Mariana (Kevin Fleming and Maria Rueda) disclose to the buyer of the shares (i.e. the Settler) any and all transactions that have been made, specially land transactions made, and that are pending registration in public record, and the Settler shall ensure that this information is passed on to the Litigating Group in its entirety; and

    (2) that the current owners of Seaside Mariana are prohibited from taking any further action relating to these transactions and pending transactions on behalf of any of the Seaside Mariana entities and that all Powers of Attorney issued by the current owners of Seaside Mariana are revoked with effect immediately upon SM Closing.


## Article II

1. Notices. All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally, by e-mail to the addresses of the Parties as set out and agreed separately between the parties. Any notice personally delivered or sent by e-mail shall be deemed to have been given and received at the time of delivery, unless otherwise proven. All Parties shall be entitled to designate new contact information by giving notice thereof to the other Parties in accordance with the terms hereof.

2. Assignment/Successors. This Agreement shall be binding upon all successor, assigns, heirs, agents and representatives of each of the Parties.

3. Governing Law: This Agreement shall be governed by and construed in accordance with the laws of San Francisco, California in the United States of America, and thus that shall be the jurisdiction and venue for this contract. (Spanish documents, which will follow Nicaraguan law, will be utilized to effectuate the land transfer).

---

[1] "clear and unencumbered" from a mortgage standpoint, in other words, there is no mortgage debt on the lands. Property taxes are owed, and there are various liens on the lands as per the most recent Libertad de Gravamen, dated April 2018, which is an Exhibit to this contract.

4. <u>Entire Agreement.</u> This Agreement may not be amended or modified, and no provisions hereof may be waived, without the written consent of the Parties.

5. <u>Severability.</u> If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

6. <u>Titles and Subtitles.</u> The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

7. <u>Execution.</u> This Agreement may be executed in counterparts and all of such counterparts taken together shall be deemed to constitute one and the same Agreement. The Parties may execute this Agreement via facsimile transmission or electronic communication and such execution and delivery shall be full, binding and proper execution and delivery without the need for the exchange of originally executed copies of this Agreement between the Parties.

8. The parties agree they are sophisticated in business matters and have access to counsel. They also have collaborated on the drafting and editing of this contract. Accordingly this contract will not be construed in favor or against either party including the original drafter.

[Signature page follows]

IN WITNESS WHEREOF, the Parties hereby state that they are fully empowered to act and agree to the obligations contained in this Agreement and that consequently, each one accepts each and every clause contained herein in the terms and under the conditions hereby stated.

IN WITNESS WHEREOF CARL (KALLE) WESCOTT has executed this Agreement on this (Day) 11 of August 2018 in the city of San Francisco, California; United States of America.

**PRINT NAME(S):**

_Carl (Kalle) Wescott_                    _CK Wescott_
(Settler Print Name)                    (Settler Signature)

.IN WITNESS WHEREOF David Crowe has executed this Agreement on this (Day) 11 of August 2018.

_____              _____
(Print Name)                           (Signature)

IN WITNESS WHEREOF Mike Lyonette has executed this Agreement on this (Day) 11 of August 2018.

_____              _____
(Mortgage Holder Print Name)           (Mortgage Holder Print Name)

**Exhibit:**

The following exhibit is an integral part of this Settlement Agreement

A.      Most recent Libertad de Gravamen



EXHIBIT A

DIEZ CÓRDOBAS                    SERIE "P"

SEÑOR (A) REGISTRADOR (A) PÚBLICO DE LA PROPIEDAD INMUEBLE Y MERCANTIL

DE LA CIUDAD DE MANAGUA. YO, JAIRO JOSÉ MALTEZ MEDAL, MAYOR DE EDAD,

ABOGADO Y NOTARIO PÚBLICO, DE ESTE DOMICILIO, Y PORTADOR DEL CARNÉ DE

IDENTIDAD DE LA CORTE SUPREMA DE JUSTICIA NÚMERO 11516, LE SOLICITO A USTED ME CERTIFIQUE LIBERTAD

DE GRAVAMEN DE PROPIEDAD HORIZONTAL DE LA FINCA NÚMERO CUATRO MIL DOSCIENTOS CINCUENTA Y UNO

(4251) PH, TOMO NÚMERO CUARENTA Y SIETE PLECA CUARENTA Y NUEVE (47/49) PH, FOLIOS NÚMERO TREINTA Y

UNO PLECA TRESCIENTOS GUIÓN UNO PLECA SESENTA Y SEIS (31/300 Y 1/66), ASIENTO PP/MERC (1) DE LA

COLUMNA DE INSCRIPCIONES DE LA SECCIÓN DE DERECHOS REALES.

Managua, viernes 21 de julio del 2017.

Abogado y Notario Público

Carné No 11516

LA SUSCRITA REGISTRADORA AUXILIAR DEL DEPARTAMENTO DE MANAGUA CERTIFICA: Que

la finca inscrita bajo el No. 4251-PH; Tomo 47-PH; Folios 31 al 300; Tomo 49-PH; Folios 1 al 66;

Tomo 136-PH, Folios 91 al 104, Asiento 1 y 2. Columna de Inscripciones, sección de Derechos

Reales, Libro de Propiedades Horizontales, de este Registro Público. Pertenece el resto a: Seaside

Marina Spa & Golf Resort Sociedad Anónima. Y tiene hipoteca a favor de Michael Francis

Lyonette, tan solo por lo que hace a los Módulos Nos. 18, 19, 29, 30, 31, por las siguientes sumas: 1)

Trescientos sesenta y tres mil ochocientos cincuenta y dos dólares equivalente a siete millones

ochocientos noventa y cinco mil  quinientos ochenta y ocho córdobas con cuarenta centavos de

córdobas; 2), Cuatrocientos tres mil setecientos noventa y tres dólares equivalente a ocho millones

setecientos sesenta mil ciento treinta y ocho córdobas con diez centavos de córdobas,  para un monto

total de Dieciséis millones setecientos cincuenta y cinco mil setecientos veintiséis córdobas equivalente a

setecientos sesenta y siete mil quinientos cuarenta y cinco dólares, posteriormente se amplió dicho

crédito hasta la suma de veintiséis millones setecientos ochenta y nueve mil seiscientos setenta y tres

córdobas con treintiún centavos equivalente a un millón ciento cuarenta y un mil trescientos cuarenta

seis dólares. En asientos 1 y 2 ***** También tiene inscritas Provisionalmente venta de los

siguientes lotes indivisos: 1) A favor de Thomas Edward Austin, identificado como lote GB, con un área de mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 2) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 3) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 4) A favor de Judith Gail Madgett y Robert Daniel Madgett, identificado como lote GBU, con un área de ochocientos cincuenta y siete punto setecientos ochenta y uno metros cuadrados, inscrito el 22-05-2012, pero se encuentra pendiente la firma del registrador; 5) A favor de Thomas Edward Austin, identificado como lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 6) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y uno metros cuadrados; 7) A favor de Thomas Edward Austin, identificado como lote RM, con un área de un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 8) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 9) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 10) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 11) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de firma del registrador; 12) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiún punto setecientos veinticinco metros cuadrados; 13) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote DVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 14) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 15) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 16) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; 17) A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área de un mil

ciento diecisiete punto quinientos setenta y tres metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de la firma del Registrador;   18) A favor de Anthony David Bowman  y Carol Anne Bowman, identificado como  lote GCR, con un área un mil ciento dieciséis punto quinientos setenta y tres metros cuadrados; 19) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 20) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GBV, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y un metros cuadrados; 21) A favor de Thomas Edward Austin, identificado como Lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 22) A favor de Thomas Edward Austin,  identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, 23) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ,  con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 24) A favor de Thomas Edward Austin, identificado como lote GB, con un área de un mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 25) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 26) A favor de Thomas Edward Austin, identificado como lote RM, con un área un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 27) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 28) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiuno punto setecientos veinticinco metros cuadrados; 29) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 30) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 31) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 32) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 33) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 34) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece

metros cuadrados; 35) Tiene inscrito provisionalmente Dacion en pago a favor Desarrollos Inmobiliarios Tejas, Sociedad Anónima sobre los siguientes lotes indivisos: 1) Lote N° 20, con un área de diecinueve mil doscientos setenta, y cinco punto novecientos veintitrés metros cuadrados; 2) Lote N° 28, con un área de ciento noventa y dos mil novecientos, sesenta y cuatro punto ciento ochenta y cinco metros cuadrados; 3) Lote N° 21, con un área de treinta y nueve mil quinientos ochenta punto cero noventa y seis metros cuadrados; 4) Lote N° 22 , con un área de nueve mil cincuenta y seis punto seiscientos setenta y nueve metros cuadrados; 5) Lote N° 23, con un área de cuatro mil setecientos sesenta y uno punto doscientos cuarenta y tres metros cuadrados; 6) Lote N° 25, con un área de sesenta y un mil quinientos treinta punto setecientos setenta y cinco metros cuadrados, inscrita con fecha veinte de junio del año dos mil trece, pero se encuentra pendiente la firma y sello del registrador. 36) Tiene anotada demanda en la via ordinaria con acción de pago de daños y perjuicios, a solicitud de Edward Albert Cole por la suma de cuarenta y ocho millones ochocientos treinta y tres mil setenta y nueve córdobas con catorce centavos equivalente a dos millones setenta y tres mil diez dólares con cincuenta centavos. 37) Tiene anotada Dacion en Pago a favor de los señores: Edward Albert Cole, los siguientes lotes. 1) Lote GSA, con un área de: un mil ciento treinta y siete punto setecientos noventa y tres metros cuadrados, 2) Lote GSB, con un área de: un mil ochenta y siete punto diecisiete metros cuadrados, 3) Lote GSC, con un área de:   un mil ciento cincuenta y seis punto ochocientos un metros cuadrados, 4) Lote GSD, con un área de: un mil ciento setenta y siete punto doscientos noventa y seis metros cuadrados, 5) Lote GSE, con un área de un mil ciento cincuenta y tres punto seiscientos diez metros cuadrados, 6) Lote GSF, con un área de un mil ciento veinticinco punto setecientos cinco metros cuadrados, 7) Lote GSG, con un área de un mil noventa y siete punto ochocientos metros cuadrados, 8) Lote GSH, con un área de un mil setenta y uno punto trescientos setenta y tres metros cuadrados, 9) Lote GSI, con un área de un mil ciento cuarenta y un punto noventa y tres metros cuadrados, 10) Lote GSI, con un área de un mil trescientos setenta y dos punto cero cero seis metros cuadrados, 11) lote GSK, con área de un mil ochocientos treinta y uno punto cuatrocientos cincuenta y uno metros cuadrados, 12) Lote GSL, con un área de un mil ochocientos veintidós punto novecientos setenta y ocho metros cuadrados, 13) Lote GSM, con un área de un mil trescientos sesenta y ocho punto novecientos treinta y uno metros cuadrados, 14) Lote GSN, con un área de un mil ciento diez punto novecientos cincuenta y ocho metros cuadrados, 15) Lote GSO, con un área de un mil ciento cuarenta y nueve punto cuatrocientos cinco metros cuadrados, 16) Lote GSP, con un área de un mil doscientos cincuenta y nueve punto setecientos noventa y cinco

metros cuadrados; 17) Lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados, 18) Lote GSV, con un área de un mil trescientos veintiséis punto sesenta y seis metros cuadrados, 19) Lote SSW, con un área de un mil trescientos setenta punto quinientos dieciocho metros cuadrados, 20) Lote GSX, con un área de un mil cuatrocientos cuarenta y uno punto cuatrocientos seis metros cuadrados, 21) Lote GSY, con un área de un mil seiscientos noventa y dos punto ciento cincuenta y uno metros cuadrados, 22) Lote GS2, con un área de un mil novecientos sesenta y cinco punto cuatrocientos dieciocho metros cuadrados, 23) Lote GSAA, con un área de dos mil doscientos veintisiete punto setecientos cincuenta y cinco metros cuadrados, 24) Lote GSAB, con un área de dos mil quinientos dieciocho punto doscientos noventa y uno metros cuadrados, 25) Lote GSAC, con un área de cuatro mil doscientos treinta punto trescientos cincuenta y dos metros cuadrados, 26) Lote GSDA, con un área de cuatro mil cuatrocientos treinta y seis punto ciento treinta y un metros cuadrados, 27) Lote GSAE, con un área de tres mil novecientos setenta y cuatro punto novecientos veinticinco metros cuadrados, 28) Lote GSAF, con un área de cuatro mil ciento cuarenta punto ciento cuarenta y dos metros cuadrados, 29) Lote GSAG, con un área de cuatro mil seiscientos cuarenta y dos punto trescientos sesenta y cinco metros cuadrados, 30) Lote GCA, con un área de tres mil sesenta y ocho punto ciento doce metros cuadrados, 31) Lote GCB, con un área de tres mil novecientos cincuenta y nueve punto doscientos ochenta y tres metros cuadrados, 32) Lote GCC, con un área de cuatro mil seiscientos veintiséis punto setecientos veinte metros cuadrados, 33) Lote GCD, con un área de cuatro mil doscientos veintiún punto seiscientos treinta y dos metros cuadrados, 34) Lote GCS, con un área de tres mil setecientos veintiséis punto seiscientos cincuenta y cinco metros cuadrados, 35) Lote GCF, con un área de tres mil ciento cincuenta y seis punto doscientos cuarenta y tres metros cuadrados, 36) Lote GCG, con un área de dos mil seiscientos ochenta y cuatro punto setecientos cuarenta y siete metros cuadrados, 37) Lote GCH, con un área de dos mil cuatrocientos noventa y nueve punto quinientos treinta metros cuadrados, 38) Lote GCI, con un área de dos mil seiscientos treinta y siete punto trescientos ochenta metros cuadrados, 39) Lote GCI, con un área de dos mil quinientos noventa y dos punto novecientos veinte metros cuadrados, 40) Lote GCK, con un área de dos mil cuatrocientos dieciséis punto ochocientos cuarenta y dos metros cuadrados, 41) Lote GCL, con un área de dos mil seiscientos cincuenta y dos punto cuatrocientos setenta y cuatro metros cuadrados, 42) Lote GCM, con un área de dos mil cuatrocientos treinta y seis punto novecientos veinte metros cuadrados, 43) Lote GCN, con un área de dos mil nueve punto quinientos setenta y uno metros cuadrados, 44) Lote No.27, con un área de

doscientos cuarenta y dos mil ochocientos setenta y cinco punto seiscientos ochenta y seis metros cuadrados, 45) Lote No.24; con un área de doce mil ochocientos cuarenta y dos punto doscientos veintiuno metros cuadrados, 46) Lote No. 26, con un área de cincuenta y siete mil setecientos diecinueve punto seiscientos sesenta y ocho metros cuadrados, *** 38)  Promesa de venta, a favor de PKR Holding, Sociedad Anonima, sobre los siguientes lotes, a) lote OVK, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, b) lote GAY, con un área de un mil cuatrocientos treinta punto setecientos treinta y siete metros cuadrados, c) lote GAX, con u na res de un mil cuatrocientos ventinueve punto seiscientos sesenta y tres metros cuadrados, por la suma de tres millones seiscientos treinta y un mil seiscientos ochenta y cinco córdobas con sesenta centavos de córdobas, *** 39) promesa de venta, a favor de Advantage Ventures LLC, un lote con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, por la suma de dos millones ochocientos noventa y nueve mil setecientos dos córdobas con treinta y cinco centavos, equivalente a ciento nueve mil quinientos dolares, *** 40) Promesa de venta a favor de Paul Brian Ciceri, un lote de terreno identificado como GAV, con un área de un mil cuatrocientos siete punto ochocientos setenta y ocho metros cuadrados, por la suma de setecientos ochenta y dos mil treinta y cuatro córdobas equivalente a veintinueve mil trescientos ochenta y dos dolares, *** 41)  Demanda, ordinaria con acción de resolución de contrato, para que por sentencia firme a declare, lo siguiente: a) que  se deje sin efecto el contrato de oferta de compra sobre el lote OVGG, b) que  se deje sin efecto el contrato de oferta de compra sobre el lote NGJ, c) devolución de precio mas intereses, d) pago de los costos daños y perjuicios ocasionados por el incumplimiento, *** 42) Demanda en la via ordinaria con acción de resolución de contrato por incumplimiento para que por sentencia se declare lo siguiente: a) disuelto el contrato de promesa de venta , b) devolución de precio mas intereses, c) pago de los costos daños y perjuicios ocasionados por el incumplimiento. ***43) Demanda ordinaria con acción de resolución de contrato por incumplimineto,  promovida por Darrell Lee y Bushnell y Amy Bushnell, *** 44) Demanda ordinaria con acción de resolución de contrato en consecuencia de conformidad al articulo 1061 y 1063 Pr. Declareseles rebeldes para todos los efectos de la presente demanda.  En asientos 1 al 42, 41 y 43 A solicitud de parte interesada extiendo el presente certificacion en la ciudad de Managua a veintisiete dia del mes de Julio del dos mil diecisiete.

**EXHIBIT E**

From: thomaspmadden@gmail.com
Subject: Fwd: lawsuit settlement
Date: March 17, 2019 at 1:32:52 AM PDT
To: editorial@kevinifleming.com

Subject: lawsuit settlement

This is a compilation of much thought and possibly the only solution Kevin that I
have gathered in hours of discussion w those in a position financially to conclude a
very complicated situation-here goes ...

To defeat Cole's attempt to seize all the remaining SM lands from SM/Fleming, we
think a settlement of the Lyonette claims and our LG claims could be made on the
following terms.  This settlement would take legal precedence over Cole's lawsuit
annotation on the Public Registry.  So, we would receive certain SM lands
consisting of : 1) all remaining unregistered oceanfront land extending to a
distance of 1,000 feet inland parallel to the SM oceanfront boundary line.  2) all
remaining unregistered land laying within a line parallel to, and at a distance of
1,000 feet,  from the North boundary line, with one end of such line beginning at
the public road, and ending 1,000 feet from the oceanfront boundary line. The
settlement parcel(s) must include the water well site.
Together with receiving this land and us tendering a payment of $ 250,000 cash to
SM, we would agree to settle all our legal claims against SM and Flemings, and we
would remove all related encumbrances from the Public Registry.

In addition, we would agree to buy all SM lands remaining in Managua province
after the above settlement, and after the Cole lawsuit annotation has been removed
from the Public Registry.  For this land we would pay 150,000 cash to SM.

Lastly, we would agree to fund the purchase of all SM stock shares by a 3rd party
not part of the present litigation between SM and the Crowe/Lyonette groups  for
the sum of  100,000 upon the settlement of all legal claims and enforcement
actions which may be in place against SM by the various Nicaragua government
agencies, to include filing of all overdue tax reports.

Adding ...

It may be that Carl Wescott is still interested in buying the stock shares, even though Fleming informed him that he has terminated their Stock Purchase Agreement.

I understand  Wescott disputes the validity of Flemings termination effort.

With that Kevin -I'll be available to discuss w you by tomorrow ... this could move quickly -

Thomas

1  CARL A. WESCOTT
   8210 E. VIA DE LA ESCUELA
2  SCOTTSDALE AZ 85258
3  *in propria persona*
   CARLWSOJ@GMAIL.COM
4  +1 936 937 2688

5
6                **UNITED STATES DISTRICT COURT**
7                **NORTHERN DISTRICT OF CALIFORNIA**

8   CARL A. WESCOTT,                    Civil Action No. 3:20-cv-06456-JD

9              Plaintiff,               **EXHIBIT F:**

10                                      **SWORN AFFIDAVIT OF**
       vs.                             **CARL WESCOTT**
11
12  DAVID CROWE;
    MIKE LYONETTE;
13  JEFF RAU;
    COLIN ROSS;
14  BRAD MALCOLM;
    MICHAEL JIMENEZ,
15
16             Defendants

17

18       I, Carl Wescott, hereby swear under penalty of perjury of the laws of California and of the

19  United States of America, that the following facts are true, to the best of my memory, recollection,

20  and belief:

21
22  1.  I am 53 years old, and a resident of Scottsdale, Arizona.

23  2.  I am competent to testify. Were I to be called to testify in this matter, my testimony would be as

24      follows, and until that point, my written testimony is as such:

25

26                                                                                    1

              **SWORN AFFIDAVIT OF CARL WESCOTT**

a.  First, I hereby verify all of the facts in my original (state court) legal complaint as being true.

b.  I further verify all of the facts in my Case Summary (Exhibit C) as being true.

c.  I further verify that the other exhibits I have attached are true and correct copies of the actual emails (Exhibit E) or documents (Exhibit A and Exhibit B)

d.  In the case of the attached contract (Exhibit D), I hereby verify it as the authentic contract, but I attached one only executed by me.  Mr. Crowe and Mr. Lyonette also executed this contract, as will be further verified by my and their copies of the fully-executed contract in discovery.

## BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT

3.  I was an experienced international real estate developer focusing on residential developments in Latin America.

4.  I was reasonably successful until the global meltdown and credit crunch of 9/2008.  With the global impact of said credit crunch and the leverage I had applied to my real estate holdings, I eventually succumbed to those forces and declared chapter 7 bankruptcy in early 2012.

5.  Post-bankruptcy, I searched for distressed real estate assets that I could acquire and turn around.  I was familiar with Seaside Mariana ("SM"), an ambitious development on approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua.

6.  Seaside Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

7. SM was an attractive investment and development opportunity for the original developer, Kevin Fleming, for at least the following reasons:

    (i)    The real estate was prime in terms of location and amenities;

    (ii)   At the time of initial investment, the market was rising faster than linearly;

    (iii)  Costa Rica to the South had already surfed a 20-year wave of real estate equity appreciation, and for some product types there was an order of magnitude difference in pricing;

    (iv)  Nicaragua was attractive for American retirees in particular because of its low cost of living, level of safety, accessibility (including airlift), and desirable climate.

8. Most of those reasons were relevant more recently to me as well for my investment consideration.

9. Further, the intangible assets associated with SM were sound and mostly in place, including plans, permits, designs, and marketing material.

10. There was one intangible asset of SM that made it particularly interesting to me.

11. The value of the project was, to a material degree, artificially depressed by more recent market conditions and bad word of mouth and internet postings concerning the lack of infrastructure put in by the original developer, leading to further relevant issues.

12. In my period of abject poverty after my chapter 7 noted above, I've entered contract to purchase SM three (3) times.  The first time I entered contract, I saw an opportunity to buy SM for a highly attractive price (US $500,000, plus some capped deferred payments), solve the issues,

3

and complete the development, and had a backer who would provide financial support for the project.

13. Most recently, I entered into contract ("the SM Purchase Contract") to purchase SM (either the company itself or the real estate, at my option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018.

14. My plan was to acquire the SM company.

15. Lacking in capital, I entered discussions with several investors to back the purchase.

16. More recently, in August 2018, I entered into a contract with investors, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by the SM company.

17. That contract shall be referred to as the "Funding Contract", and is attached hereto as Exhibit D.

18. To dispel any confusion over identities in the contract, I, Carl Wescott, am sometimes referred to by my Finnish name "Kalle", or the combination Carl "Kalle" Wescott. (My mother is from Finland; Finnish was my first language; I strongly identify with my Finnish family and Finnish roots).

19. To further dispel any potential confusion over the language of the funding contract or its meaning, the investors who were parties to the Funding Contract had filed litigation against Seaside Mariana, the company that I was purchasing.

20. Therefore, the group of twenty-two investors (the same set of people who were the initial twenty-two (22) Defendants in Maricopa County Superior Court case CV2020-006232) who were the parties to that litigation are referred to as the "Litigating Group."

21. I did not want ongoing litigation against the company I was purchasing, and I had worked out a deal with the Litigating Group, and thus the thought was that I (aka "the Settler" in the Funding Contract) would immediately settle with the Litigating Group upon closing the purchase of the Seaside Mariana company, by transferring all its land to them. They, in turn, had already agreed to fund all US $500,000 that I (the "Settler") needed to purchase the SM company, plus most of the closing costs.

22. Once I effectuated the transfer of the SM land (via the Seaside Mariana company, which I would then own and control) to the Litigating Group, they would then pay me and my company, another US $334,000 in quarterly payments.

23. That group of twenty-two (22) investors (the named Defendants in CV2020-006232, aka "the Litigating Group) all agreed to collectively be bound by the Funding Contract and to fund the payments in the Funding Contract.

24. Two of the Defendants, David Crowe and Mike Lyonette, agreed to manage their group and, for expediency, communications with me.

25. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who agreed to be bound by the Funding Contract: David Crowe; Mike Lyonette; Thomas P. Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela; Robert Crowe; Bernadette Brown; Federico Gurdian; and Terencio Garcia.

26. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of twenty-two (22) investors.

27. For stylistic purposes and economy of phrase, the above twenty-two (22) Defendants, who acted in concert to fund my purchase of SM, will also be described as "the Crowe Group" – this is the descriptive phrase that the parties all used colloquially, before the need for the litigation in the case at bar.

28. In August 2018, David Crowe and Mike Lyonette signed NCNDs with me.

29. Mr. Crowe and Mr. Lyonette pledged not to share any information about me or the Funding Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure).

30. Approximately 10 of the 20+ investors signed NDAs with me, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Funding Contract and their NDAs, I believes only the dozen or so of them would have gotten information related to the Funding Contract and its progress towards a closing after that point.

31. The NDAs granted jurisdiction of my choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision could very well cost me over US $10 million in damages.

32. I shared information with Mr. David Crowe in strict confidence on how I expected to monetize the intangible assets of the Seaside Mariana company, with an expected US $8 million post-tax profit from two of those intangible assets.

**PLAINTIFF'S OTHER DEALS WITH KEVIN FLEMING**

33. After the Funding Contract was signed, I signed more contracts with Kevin Fleming, to purchase Isla Mariana (another real estate development) and to purchase seven more Panamanian and Nicaraguan companies.

34. I subsequently purchased the legal claims of Kevin Fleming, Maria Rueda, and the relevant entities.

35. Outside of Seaside Mariana, and as shall be proven in court, I expected to possibly make on the order of US $4,000,000 to US $5,000,000 with the completion of the other related deals.

36. I disclosed the existence of my other deals with Kevin Fleming to the Crowe Group via Mr. David Crowe (as well as another deal I was working on in Jamaica).

37. One particular reason I shared information with Mr. Crowe on my other contracts with Kevin Fleming et al. was to ensure that both purchasing parties (me, for example, buying another residential development called Isla Mariana from its owners; and the Crowe Group, essentially purchasing ~1000 acres of Seaside Mariana via me) were getting the land that they expected to get.

38. Because I was also purchasing Mr. Fleming's development company Nicaragua Developments (which also owned land), and the parent company of Seaside Mariana (Grupo Mariana), via some of these other deals, I would have the power and ability to ensure that my and the Crowe Group's expectations were met.

39. The Crowe Group had information on Seaside Mariana going back to 2006, and thus was able to build maps of all the Seaside Mariana land, including the list of parcels they should get

7

transferred to their new entity at my close of the purchase of the Seaside Mariana company. (Because a massive subdivision had occurred, this was important).

40. Because I was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing me for US $834,000, I was going to make US $334,000 in short-term cash profit in closing my purchase of SM and flipping the land to the Crowe Group (aka the Litigating Group).

41. In addition, as referenced above, and as shall be fully proven at jury trial, I expected to make a much larger sum monetizing the intangible assets I was acquiring as part of this deal.

42. The Crowe Group performed its due diligence on the deal and agreed to move forward to a close.

43. As part of due diligence, the Crowe Group had its attorney go to the local municipal office and ensure that Seaside Mariana still owned all of the relevant land fee simple, and that there was no secured debt mortgage obligation on the land, and no unexpected liens nor unexpected notations in the property registry.

44. After the Crowe Group's due diligence, the Crowe Group agreed that they would fund the $25,000 that I was required to submit to Kevin Fleming after his due diligence.

45. That moment would also kick off a 60-day closing cycle for me to close on my purchase of SM, and for the Litigating Group (the Crowe Group) to fund said purchase.

46. Because I knew that Seaside Mariana had taken in US $ 22 million in sales from purchasers and investors, I insisted that Kevin Fleming and the other owners of Seaside Mariana file taxes up to the present.

47. I negotiated a Closing Contract with Kevin Fleming which the relevant parties signed, in which the parties agreed to close my purchase (their sale) of the Seaside Mariana company within 60 days.

48. As part of the Closing Contract, I would pass through US $25,000 to Kevin Fleming, which Mr. Fleming pledged to use in significant part for tax professionals to file all of Seaside Mariana's taxes through the present. (Some of it would be used by the Seaside Mariana sellers to prepare for closing).

49. David Crowe then remitted a $25,000 cashier's check, which I utilized to satisfy my obligation to fund the closing process in the Closing Contract (by depositing it in Kevin Fleming's Wells Fargo bank account).

50. (In the Funding Contract, the Twenty-Five Thousand Dollars is on page 1, Article I, paragraph 1, where it is a non-refundable deposit).

51. It is worth noting that early in my process with the Crowe Group, the Crowe Group had essentially committed to funding the purchase but only if everything was as they expected (due diligence on all files and details), and further details could be worked out.

52. As of August 11th, 2018, when the Crowe Group / Litigating Group agreed to the Funding Contract with I, the Crowe Group still had one contingency to pull out of the deal, if anything about their due diligence did not pass muster. (This was also in the Funding Contract, page 1, Article I, paragraph 1, where the Crowe Group could let the Funding Contract unwind)

53. However, once the Crowe Group / Litigating Group had completed due diligence and remitted the US $25,000 non-refundable deposit towards the US $500,000 purchase price I had to pay to

9

purchase the SM company (US $475,000 more after the US $25,000), the Crowe Group no longer had any contingency to pull out of the deal.

54. At that point, the Crowe Group (including these Defendants) were fully committed to the funding outlined for my purchase of Seaside Mariana, with no contingency to get out of the Funding Contract.

## DEFENDANTS' INITIAL BREACH

55. The Funding Contract called for a closing date in mid-October-2018, as did my purchase contract of Seaside Mariana (reinforced in subsequent signed Closing Contracts).

56. The parties retained attorneys to prepare closing documents.

57. The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings.

58. In the agreed logistics, I would acquire the entity Seaside Mariana Golf and Spa Resorts company, which owned all the Seaside Mariana land, using another US $475,000 of the Crowe Group's money for said close.

59. Then, I would transfer the lands in the Funding Contract to the entity of the Crowe Group's choice. (I would then get the other US $334,000 in a series of payments to me and my entity).

60. It is worth noting that one condition of close (in the Closing Contract) was not fulfilled by Kevin Fleming; namely, he did not file the taxes for Seaside Mariana for the missing years.

61. However, this was my issue and not the Crowe Group's. I would be the owner of the Seaside Mariana company. I worked out with David Crowe, on behalf of the Crowe Group, that I would

take responsibility for the taxes and simply file them for Seaside Mariana, as the new owner, after the close of my purchase of the SM company.

62. The Crowe Group agreed, via David Crowe, that this was acceptable to them and would not be a barrier to the close, nor their funding of it.

63. As part of the logistics for the close, I offered to provide a limited power of attorney in my name, to David Crowe's wife, that would be valid only to transfer the Seaside Mariana land out of the Seaside Mariana company.

64. At this point, in October 2018, I had fully performed as per the parties' contract, as far as I could without the US $475,000 promised in the Funding Contract.  Within a few days, with the help of attorneys, the closing would happen, and using the Crowe Group's US $475,000, I would purchase the Seaside Mariana company, thereby owning its shares.

65. I would then immediately transfer the land to the Crowe Group's designated new entity (or let Mr. Crowe's wife handle this step via the limited power of attorney).

66. It was now time for the Defendants to perform with the rest of the funding promised in the Funding Contract for my purchase of the Seaside Mariana company; namely, the additional US $475,000.

67. However, just before I should have flown to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed me that there was a new issue that could impact the anticipated closing.

68. Mr. Crowe informed me that Mr. Ted Cole had sued Seaside Mariana again.  (Mr. Cole had previously sued Seaside Mariana and settled for a significant part of the Seaside Mariana land).

69. At this point, the Litigating Group was already aware of the other contracts I had signed with Kevin Fleming, Maria Rueda, Grupo Mariana, and Nicaragua Developments to purchase another eight of the real estate ownership and real estate development company.

70. David Crowe and the Litigating Group were also aware of a deal I was working on with the Jamaican government, as Mr. Crowe kindly lent me $5,000 so I could travel to Jamaica and for related costs. (In a few successive loans, Mr. Crowe kindly lent me approximately US $11,500, which I would like to repay to Mr. Crowe, with interest, when I am able).

71. I then revealed to Mr. Crowe, and thus all of these Defendants, that I had also purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims. I thus had the right, using assigned legal claims, to sue Mr. Cole for his past tortious acts against Mr. Fleming, Ms. Rueda, and the Seaside Mariana company.

72. Mr. Crowe and I obtained a copy of the new Ted Cole legal complaint, and it was frivolous at best.

73. I was therefore unconcerned about the Cole litigation and planned defensive litigation for Seaside Mariana as soon as I owned the Seaside Mariana company in a few days.

74. I proposed to these Defendants, via Mr. Crowe, that the combination of offensive litigation against Mr. Cole (for past tortious acts) and defending the frivolous new legal complaint would be a simple, inexpensive, and effective remedy to solve any concerns about the Cole legal complaint.

75. Further, as I pointed out, the new Cole litigation was my problem, as the soon-to-be-owner of the Seaside Mariana company, which was the entity getting sued.

76. I pointed out that within days the Seaside Mariana land would be transferred to the Litigating Group's designated new entity. As that new entity was about to be formed, it clearly would have no liability to anyone including Mr. Cole.

77. However, the Litigating Group, including these Defendants, refused to fund my purchase of the Seaside Mariana company (contrary to their promises, representations, obligations, and responsibilities set out in the Funding Contract).

78. David Crowe then assured me that Seaside Mariana was no longer attractive to any of the Litigating Group.

79. The reason stated by Mr. Crowe that the Litigating Group now had zero interest in the SM company and SM land, and also zero interest in honoring the Funding Contract, was the new Ted Cole litigation.

80. I don't consider this a valid reason to breach a contract, but it is interesting in light of Mr. Crowe and the Litigating Group's further actions, below.

## THE SECOND BREACH AND REPUDIATION (ON BEHALF OF ALL DEFENDANTS)

81. In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming on behalf of the Crowe Group, with the following email (Exhibit E), attempting to purchase Seaside Mariana, despite:

   a.  The non-circumvent these Defendants and the Crowe Group had agreed to.

   b.  The Funding Contract they had signed.

   c.  The various representations they made in October 2018, just before the parties would have closed, that they were pulling out and were no longer interested in the Seaside Mariana land.

**THE THIRD CROWE BREACH/REPUDIATION (ON BEHALF OF ALL DEFENDANTS)**

82. In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email, attempting to negotiate a direct purchase of the SM company and land (without involving me).

83. In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe Group breach as well as the second breach and repudiation (Madden contact of Fleming to try to buy directly) of the Funding Contract.

**FURTHER RAMIFICATIONS OF THE CROWE GROUP BREACHES**

84. In and after March 2019, once Thomas Madden contacted Kevin Fleming to negotiate with him directly, on behalf of the Crowe Group, and once David Crowe followed through and continued those negotiations on behalf of all Crowe Group members and all Defendants, Kevin Fleming stopped returning my phone calls.

85. (In December 2019, Kevin Fleming emailed me to say Fleming was terminating the Purchase Contract. However, Mr. Fleming did not have the legal right to do so).

86. Fleming refused to honor any of the rest of my contracts with him or his entities.

87. As a result, I have potentially lost another US $4 million or more, as shall be further proven at trial (with US ~$3 million of profits expected to come from the Isla Mariana / Nicaragua Developments deals).

88. (I admit that these profits were speculative, and that from a legal standpoint, each expected potential profit must be multiplied by the percentage chance that I would have realized that particular profit. I will prove these numbers and these more speculative damages at jury trial).

89. I am doing what I can to mitigate the damages.

90. To my surprise, these Defendants have thus far (through today) demonstrated zero interest in working with me in any way to mitigate the very significant damages associated with my planned purchase of the Seaside Mariana company.

91. However, as I had stated in email to Mr. Troy Romero, we are all adults and responsible for our own actions and decisions (and also the lack thereof).

92. The Defendants' breaches, repudiations, false promises, representations, and assurances, not to mention their tortious acts and non-acts, and their negligence have caused significant damages to me, in an amount to be proven at trial.

93. I will continue to do my best to mitigate the base damages, especially my hoped-for and expected profits from purchasing the Seaside Mariana company (other than the US $334,000).

94. I contacted David Crowe of the Crowe Group to see if we could work something out, whether a way to move forward, or a settlement, but Mr. Crowe was not interested.

95. I have had similar discussions with Mr. Rau, Mr. Madden, and Mr. Jimenez, with no interest by those parties in continuing a discussion about ways I can still close on the Seaside Mariana company (if that is even relevant or possible). Mr. Rau and Mr. Jimenez had no interest in that nor in any settlement discussions.

96. I was left with no choice but to file a legal complaint so that the scales of justice may be righted and balanced appropriately.

1    97. (Mr. Thomas Madden, Mr. Brian Putze, and Ms. Sandra Winfrey have all settled with me, and

2    were dismissed with prejudice in this legal complaint).

3

4

5    AFFIANT FURTHER SAYETH NAUGHT.

6

7                                                              _____

8                                                              CARL A. WESCOTT
                                                               February 16th, 2021
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

16